Citation Nr: 1114716 
Decision Date: 04/14/11 Archive Date: 04/21/11

DOCKET NO. 09-01 281 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs (VA) Regional Office in Wilmington, Delaware


THE ISSUE

Entitlement to an initial compensable rating for status post (s/p) right anterior cruciate ligament reconstruction for the period prior to February 20, 2006, and in excess of 10 percent on and after that date.


REPRESENTATION

Appellant represented by: Delaware Commission of Veterans Affairs


WITNESS AT HEARING ON APPEAL

Appellant


ATTORNEY FOR THE BOARD

M. Turner, Associate Counsel
INTRODUCTION

The Veteran served on active duty from August 1984 to June 2005.

This matter initially came before the Board of Veterans' Appeals (Board) on an appeal from a rating decision that was issued by the Regional Office (RO) in Philadelphia, Pennsylvania. It was remanded by the Board for additional development in November 2009, and has now been returned to the Board for appellate disposition. The case is within the jurisdiction of the RO in Wilmington, Delaware.

The Veteran testified before the undersigned Veteran's Law Judge at an April 2009 hearing. 

Service connection for sleep apnea was granted during remand development. That satisfies the claim as to that issue. A 10 percent rating for the right knee disorder was granted as of February 20, 2006, but no earlier. As this is not a complete grant as to this issue, the appeal continues and the issue has been recharacterized on the title page to reflect this development.


FINDINGS OF FACT

1. Prior to February 13, 2006, while the Veteran experienced intermittent knee pain, the Veteran's s/p right anterior cruciate ligament reconstruction was not shown to be productive of flexion of the right knee that was limited to 60 degrees or less, extension that was limited to 5 degrees or greater, or recurrent subluxation or lateral instability. The Veteran was not diagnosed with arthritis and there was no objective evidence of painful motion of the knee. 

2. The Veteran was diagnosed with degenerative joint disease (DJD) on February 13, 2006. Examination at that time revealed some limitation of motion that was not compensable under the rating schedule.

3. Although the Veteran was diagnosed with arthritis and had right knee pain during the period beginning February 13, 2006, the subsequent evidence does not show that he had flexion of the right knee that was limited to 60 degrees or less, extension that was limited to 5 degrees or greater, or recurrent subluxation or lateral instability of the right knee. 


CONCLUSIONS OF LAW

1. The criteria for an initial 10 percent rating, but no more, as of February 13, 2006, but no earlier, have been met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2002 and Supp. 2010); 38 C.F.R. §§ 3.159, 3.321, 4.1, 4.3, 4.7, 4.40, 4.45, 4.71a, Diagnostic Codes 5003, 5257, 5260, 5261 (2010).

2. The criteria for a 10 percent rating, but no higher, for s/p right anterior cruciate ligament reconstruction for the period beginning February 13, 2006, and thereafter, were not were met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2002 and Supp. 2010); 38 C.F.R. §§ 3.159, 3.321, 4.1, 4.3, 4.7, 4.40, 4.45, 4.71a, Diagnostic Codes 5003, 5260, 5261 (2010).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. Duty to Notify and Assist

The Veterans Claims and Assistance Act of 2000 (VCAA) describes VA's duties to notify and assist claimants with substantiating their claims for VA benefits. 
38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5107, 5126; 38 C.F.R. § 3.102, 3.156(a), 3.159.

Upon receipt of a complete or substantially complete application for benefits, VA is required to notify the claimant of any information, and any medical or lay evidence, that is necessary to substantiate his or her claim. 38 U.S.C.A. § 5103(a), 38 C.F.R § 3.159(b); Quartuccio v. Principi, 16 Vet. App. 183, 186-187 (2002). In accordance with 38 C.F.R. § 3.159(b)(1), proper VCAA notice must inform the claimant of any information and evidence not of record (1) that is necessary to substantiate the claim; (2) that VA will seek to provide; and (3) that the claimant is expected to provide. The Board notes that 38 C.F.R. § 3.159 was revised in part, effective May 30, 2008. See 73 Fed. Reg. 23,353-23,356. The third sentence of 38 C.F.R. § 3.159(b)(1), which stated that "VA will also request that the claimant provide any evidence in the claimant's possession that pertains to the claim," was removed. This amendment applies to all applications pending on, or filed after, the regulation's effective date. 

VCAA notice should be provided to a claimant before the initial unfavorable decision on a claim by the agency of original jurisdiction (AOJ). Pelegrini v. Principi, 18 Vet. App. 112, 115 (2004). However, the VCAA notice requirements may be satisfied notwithstanding errors in the timing or content of the notice if such errors are not prejudicial to the claimant. Id at 121. Further, a defect in the timing of the notice may be cured by sending proper notice prior to a re-adjudication of the claim. Mayfield v. Nicholson, 444 F.3d 1328, 1333-1334 (Fed. Cir. 2006). 

The VA General Counsel issued a precedential opinion interpreting Pelegrini as requiring the Board to ensure that proper notice is provided unless it makes findings regarding the completeness of the record or other facts that would permit the conclusion that the notice error was harmless. See VAOGCPREC 7-2004.

The United States Court of Appeals for the Federal Circuit reaffirmed the importance of proper VCAA notice in Mayfield v. Nicholson, 499 F.3d 1317 (Fed. Cir. 2007). Mayfield and its progeny instruct that a comprehensive VCAA letter, as opposed to a patchwork of other post-decisional documents, is required to meet the VCAA's notification requirements. Id at 1320. However, VCAA notification does not require a pre-adjudicatory analysis of the evidence already contained in the record. See, e.g. Mayfield v. Nicholson, 20 Vet. App. 537, 541 (2006). 

During the pendency of this claim, the United States Court of Appeals for Veterans Claims (Court) decided Dingess v. Nicholson, 19 Vet. App. 473 (2006), aff'd sum nom Hartman v. Nicholson, 483 F.3d 1311 (Fed. Cir. 2007), in which it held that VCAA notice requirements are applicable to all five elements of a service connection claim. Thus, the Veteran must be notified that a disability rating and effective date for the award of benefits will be assigned if service connection for a claimed disability is awarded. Id at 486. 

In this case, the Veteran was sent a letter in October 2005, prior to the rating decision that was appealed herein, which explained VA's duty to assist the Veteran with developing evidence in support of his claim as well as what was necessary in order to establish service connection for a claimed disability. The Veteran was sent another letter that explained how VA assigns ratings and effective dates for service connected disabilities after Dingess was decided in March 2006. 

The Veteran's claim for a higher initial rating for s/p right anterior cruciate ligament reconstruction is a downstream issue from his claim for entitlement to service connection for that disability. The RO granted service connection for s/p right anterior cruciate ligament reconstruction and assigned a noncompensable rating for that disability. The Veteran then filed a notice of disagreement arguing that he should have received a higher rating. In a December 2010 rating decision the Veteran's rating for his right knee disorder was increased to 10 percent effective February 20, 2006; however, the Veteran did not indicate that he was satisfied by that rating.

In these types of circumstances, VA is not required to issue a new VCAA letter after the initial grant of service connection. See VAOPGCPREC 8-2003. In this precedential opinion, the General Counsel held that although VA is required to issue a Statement of the Case (SOC) if the downstream issue is not resolved, 38 U.S.C.A. § 5103(a) does not require separate notice of the information and evidence necessary to substantiate the newly raised issue. Id. In this case, the Veteran was issued an SOC in December 2008 that addressed the propriety of the initial evaluation of the Veteran's knee complaints. He was also sent a supplemental statement of the case (SSOC) that addressed this issue in December 2010.

In addition to its duty to provide certain notices to the claimant, VA also must make reasonable efforts to assist the him or her with obtaining the evidence that is necessary in order to substantiate his or her claim(s), unless no reasonable possibility exists that such assistance would aid in substantiating the claim(s). 38 U.S.C.A. § 5103A; 38 C.F.R. § 3.159. In connection with the current appeal, VA has of record evidence including service treatment records, private treatment records, and a transcript of the Veteran's testimony at the April 2009 hearing.

The Veteran was also afforded 2 VA examinations of his right knee. Both of these examinations adequately documented the symptoms of the Veteran's right knee disability.

For the above reasons, the Board finds that the requirements of the VCAA were met in this case.

II. Prior Remand

This case was remanded by the Board in November 2009. A Veteran has a right to substantial compliance with the instructions that are set forth in a Board remand. See Stegall v. West, 11 Vet. App. 268, 271 (1998); See also Dyment v. West 13 Vet. App. 141, aff'd sub nom Dyment v. Principi, 287 F.3d 1377, 147 (2002) (remand not required under Stegall where Board's remand instructions were substantially complied with). The Board finds that here there was substantial compliance with the remand instructions.

With regard to the Veteran's claim for a higher initial rating for his right knee disability, the remand instructed that (1) VA contact the Veteran to obtain authorizations enabling it to obtain certain private treatment records, and (2) to conduct a new VA examination of the Veteran's right knee to ascertain the then current symptoms of that disability. The Veteran was sent a letter in February 2010 that requested that the Veteran sign an authorization enabling VA to obtain all of his private treatment records related to his knee. However, the Veteran provided copies of his private treatment records in April 2009. The Veteran was also afforded another VA examination in May 2010.

The remand instructions set forth certain requirements for the VA examination. Specifically, the examiner was requested to identify whether arthritis was present, state whether there was subluxation or lateral instability of the knee, conduct range of motion testing, and to identify any further limitations that the Veteran would experience after flare ups or with repeated use. The examiner who conducted the May 2010 VA examination conducted range of motion testing as well as testing to determine whether any joint laxity was present. The examiner also noted that there would be some additional loss of motion upon repetitive use but that it was not possible to quantify this in terms of degrees of lost motion because it could not be objectively measured. The examiner also identified that results of an x-ray of the right knee that showed possible mild DJD at the medial compartment of the right knee. For these reasons, the Board finds that the examination was in substantial compliance with the instructions that were set forth in the November 2009 remand.

III. Initial Rating

The Veteran contends that the symptoms of his right knee disability are more severe than the noncompensable evaluation that was assigned prior to February 20, 2006 and the 10 percent rating that was assigned thereafter. 

Disability ratings are determined by applying criteria that are set forth in the VA's Schedule for Rating Disabilities (38 C.F.R. Part 4). Ratings are based on average impairments of earning capacity resulting from particular diseases and injuries and the residuals thereof in civilian occupations. 38 U.S.C.A. § 1155; 38 C.F.R. § 4.1. Disabilities are described utilizing diagnostic codes set forth in 38 C.F.R. Part 4. Where there is a question as to which of two evaluations shall be applied, the higher rating will be assigned if the disability picture more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned. See 38 C.F.R. § 4.7.

In cases, such as this one, in which a claim for a higher evaluation arises out of the initial grant of service connection for the disability at issue, multiple ("staged") ratings may be assigned for different periods of time during the pendency of the claim and appellate process. See generally Fenderson v. West, 12 Vet. App. 119 (1999). See also Hart v. Mansfield, 21 Vet. App. 505 (2007).

The Veteran's treatment records indicate that he had surgery to treat a right knee third degree anterior cruciate ligament (ACL) tear and chrondromalacia in August 2004, while he was still in the service. He had significant right knee discomfort during the initial recovery period after the surgery and he was prescribed pain medication and underwent physical therapy. In October 2004 a physical examination of the right knee showed grade 2+ effusion. The Veteran had 130 degrees of flexion and full extension. Lachman's was grade 0 and drawer was grade 1. He was still wearing an ACL brace as was required after his surgery, and the physician informed him that he would need to be in the brace for at least 4 months. Follow up in November 2004 indicated that there was grade 1 effusion. Collateral ligaments were stable both medial and lateral. There was no pain with varus or valgus. Drawer was negative. There was no pain on palpation. The Veteran's range of motion of his knee was 0 to 125 degrees. He continued in the knee brace and in physical therapy. In January 2005 he still had some stiffness in his right knee. In December 2004 the Veteran reported that his knee felt better but he still felt week. At that time there was grade 0 Lachman on the right and grade 1 drawer. There was some atrophy of the right quadriceps. The Veteran had full extension and 136 degrees of flexion. The physician recommended that the Veteran no longer needed to wear the right knee brace and that he should wear it only with activities or in icy weather when the Veteran could fall. 

In June 2005 the Veteran complained that he still had knee pain and burning, particularly after activities. Examination of the right knee showed that the surgical incision was well healed and there were no signs of infection or inflammation. The Veteran could straight leg raise against gravity. Extension was full and flexion was to 114 degrees. There was grade 1 effusion. There was some tenderness along the inferior pole of the patella at the proximal patellar tendon insertion but otherwise there was no tenderness. There was grade 0 Lachman and varus and valgus stability were intact. There was an area of decreased sensation over the right knee. In July and August 2005 the Veteran was seen for complaints involving his back and his left knee, but he did not have further complaints about his right knee. 

After his discharge from the service in August 2005 the Veteran continued to seek follow up care for his right knee. In September 2005 the Veteran reported that his right knee was unchanged and felt stable. He was able to play golf without pain. Drawer was negative. Lachman and pivot shift were both grade 0 degrees. The Veteran had good flexion to 135 degrees and full extension. The bench test was negative. 

In January 2006, the Veteran was afforded a VA examination of various joints including his right knee. The Veteran reported that he had knee pain which had improved after his ACL reconstruction and which was treated with non-steroidal anti-inflammatory medications (NSAIDs). At that time the Veteran had painless range of motion of the knees from 0-150 degrees. There was no additional limitation of motion or of joint function due to pain, fatigue, weakness, or lack of endurance following repetitive use. There was tenderness at the right and left side of the knee. There was no creipitation, mass behind the knee, clicks or snaps, grinding, instability, patellar abnormality, meniscus abnormality, or other knee abnormality. 

On February 13, 2006 the Veteran was again seen by his private physician for bilateral knee pain, usually worse on the right side. There was no swelling or effusion of the right knee. Range of motion was 0 degrees of extension and flexion to 120 degrees with patellofemoral crepitation. There was a negative anterior drawer. At that time, the physician diagnosed DJD of the right knee, s/p right ACL knee reconstruction. This was the first diagnosis or demonstration of right knee arthritis. 

The Veteran was seen later in February 2006. At that time there was still no swelling or effusion and the range of motion was 0 to 120 degrees with patella femoral crepitation. His knee was stable on examination. The Veteran was given an injection to his right knee to help alleviate his right knee pain. He thereafter underwent a series of Supartz injections in both of his knees.

The Veteran continued to receive follow up care for his knees. When his right knee was examined for treatment purposes in March 2007 the Veteran had no swelling or effusion of the right knee. He had 0 to 120 degrees of range of motion of his knee with patellofemoral creipitation to that arc and medial joint line tenderness. He thereafter underwent another series of Supartz injections for his right knee pain. In June 2007 there was no change in the presentation of the Veteran's right knee. In August 2007 the Veteran reported that both of his knees were doing well. He reported that he was able to increase his activity without increasing pain and that his overall level of pain was more than moderately improved. Examination of the right knee showed no swelling, effusion, erethyma, or warmth. Range of motion was 0 to 120 degrees and there was mild medial joint line tenderness. 

The Veteran continued to receive follow up care for his knees. In April 2008 the Veteran again complained of bilateral knee pain. Examination of the right knee revealed a range of motion of 0 to 140 degrees with tenderness to the medial joint line and mild crepitation with range of motion. When the Veteran followed up in May 2008 there was no swelling or effusion of his right knee. Range of motion was 0 to 140 degrees with tenderness to the medial joint line and mild crepitation with motion. He received an injection to help with his right knee pain. 

At his hearing in April 2009, the Veteran testified that he continued to have right knee pain. Most years he got shots to help his knee pain but he had not had this procedure done recently. He testified that his knee hurt after walking, and especially when there was an incline or stairs. He testified that after walking his knee sometimes swelled. Sometimes it felt like it would pop out. When his knee pain flared up he used ice packs. He also took medication to treat his knee pain. He reported that he also used a knee brace. 

The Veteran's knee was again examined by VA in May 2010. The Veteran reported a pain level of 2/10 and subjective weakness and instability. He denied stiffness, welling, or redness. The Veteran described flare ups that occurred 3 to 4 times a week after walking long distances or standing too long. During flare ups the Veteran's right knee pain increased to 4/10. The Veteran used ice and his pain decreased in 30 to 40 minutes. The Veteran took Darvocet for his pain. He did not require any aids for ambulation and his gait was normal.

Examination of the right knee did not show any synovial thickening, fluid collection, or point tenderness. The Veteran's range of motion of his knee was 0 to 90 degrees. There was some pain and crepitation at the end of the range of motion. Repetitive motion did not reveal weakness, excessive fatigability, or pain. The examiner acknowledged that there would be some loss of range of motion after repetitive use of the right knee but that this could not be objectively measured. There was no muscle atrophy, swelling, joint effusion, tenderness, muscle spasm, or joint laxity. There was no varus or valgus deformity. An x-ray of the knee suggested mild DJD at the medial compartment of the right knee. 

The examiner diagnosed DJD of the right knee with decreased range of motion due to pain. There was no functional deficit insofar as the Veteran worked as a security officer without any extended periods of incapacity due to knee problems.

DJD is rated pursuant Diagnostic Code 5003. Arthritis is rated on the basis of the limitation of motion of the affected joint. When the limitation of motion of the affected joint is noncompensable under the appropriate diagnostic code, a rating of 10 percent is applied to each affected major joint or group of minor joints. In the absence of limitation of range of motion, a 10 percent evaluation is assigned for x-ray evidence of the involvement or 2 more major joints or 2 or more minor joint groups, and a 20 percent evaluation is assigned where such x-ray findings are accompanied by occasional incapacitating exacerbations. A 10 percent rating can also be assigned where there is limitation of motion that is noncompensable under the schedular criteria. See 38 C.F.R. § 4.71(a), Diagnostic Code 5003.

38 C.F.R. 4.71a, Diagnostic Code 5260, pertains to limited flexion of the knee. A 10 percent rating is applies when flexion is limited to 45 degrees. A 20 percent rating applies when flexion is limited to 30 degrees. A 30 percent rating applies when flexion is limited to 15 degrees. 

Diagnostic Code 5261 pertains to limitation of extension of the knee. A 10 percent evaluation is assigned for extension that is limited to 10 degrees. A 20 percent evaluation is assigned for extension that is limited to 15 degrees. A 30 percent evaluation is assigned for extension that is limited to 20 degrees. A 40 percent evaluation is assigned for extension that is limited to30 degrees. A 50 percent evaluation is assigned for extension that is limited to 45 degrees or greater. 

Evaluation of a service-connected disability involving a joint rated on limitation of motion requires adequate consideration of functional loss due to pain under 38 C.F.R. § 4.40 and functional loss due to weakness, fatigability, incoordination or pain on movement of a joint under 38 C.F.R. § 4.45. DeLuca v. Brown , 8 Vet. App. 202, 205-206 (1995). The provisions of 38 C.F.R. § 4.40 state that disability of the musculoskeletal system is primarily the inability, due to damage or inflammation in parts of the system, to perform normal working movements of the body with normal excursion, strength, speed, coordination and endurance. Functional loss may be due to the absence of part, or all, of the necessary bones, joints and muscles, or associated structures. It may also be due to pain supported by adequate pathology and evidenced by visible behavior of the claimant undertaking the motion. 38 C.F.R. § 4.40. The factors of disability affecting joints are reduction of normal excursion of movements in different planes, weakened movement, excess fatigability, swelling and pain on movement. 38 C.F.R. § 4.45.

Additionally, with respect to evaluating the knees, diagnostic code 5257 applies to other knee impairments; a 10 percent rating is applied when there is recurrent subluxation or lateral instability which is slight, 20 percent when it is moderate, and 30 percent when it is severe.

The VA General Counsel held that a Veteran who has arthritis and instability of the knee may be rated separately under Diagnostic Codes 5003 and 5257, provided that a separate rating must be based upon additional disability. VAOPGCPREC 23-97, 62 Fed. Reg. 63,604 (1997); VAOPGCPREC 9- 98, 63 Fed. Reg. 56,704 (1998). Also, separate rating may be assigned for limitation of flexion and limitation of extension of the same knee. Specifically, where a Veteran has both a compensable limitation of flexion and a compensable limitation of extension of the same knee, the limitations must be rated separately to adequately compensate for functional loss associated with the disability. VAOPGCPREC 9-04, 69 Fed. Reg. 59990 (2005).

The remaining diagnostic codes applicable to the knees address specific types of knee impairments which are not at issue in this case. 

The record reveals that while the case was undergoing Remand development, the RO obtained private medical records. In reviewing those records, it was determined that arthritis was first demonstrated on February 20, 2006. The decision herein backs that date up a few days.

In this case, the evidence shows that the Veteran first met the criteria for a compensable evaluation for his right knee disability on February 13, 2006, when he was first diagnosed with DJD of the right knee. This was also in private records received in remand development. Prior to that time, there was no diagnosis of arthritis and the Veteran did not have any compensable limitation of motion of the knee; in fact, at his last examination prior to his separation from the military he had full extension and 114 degrees of flexion which improved to full extension and 135 degrees of flexion by September 2005, shortly after his retirement. Full flexion is 140 degrees, so the Veteran had only very slightly reduced flexion of the knee at that time and the range of motion was limited do to arthritis, and was not limited to a compensable degree. There was also no evidence of subluxation or lateral instability of the knee insofar as the knee was specifically noted by the Veteran's treating physician to be stable in June 2005, the month before the Veteran was discharged, and there were no subsequent treatment records demonstrating objective instability. 

Beginning February 13, 2006, when the Veteran was first diagnosed with arthritis of his right knee, he met the criteria for a 10 percent rating pursuant to 38 C.F.R. § 4.71a, diagnostic code 5003, for arthritis accompanied by painful or limited motion of the affected joint. However, he did not meet the criteria for a higher rating. A 20 percent rating for limited flexion of the knee requires flexion that is limited to 30 degrees or less. The Veteran's was able to flex his knee to between 90 and 140 degrees at various times when his range of motion was tested. While there was at times pain noted at the ends of the range of motion, the Veteran's flexion was never limited to 30 degrees or less. At all times on and after June 2005, the month prior to his discharge, the Veteran had full extension of his knee when tested; thus, there is no basis for a higher rating based on limitation of extension of the knee. 

The Board considered the propriety of a separate rating for recurrent subluxation and/or lateral instability. The Board acknowledges that the Veteran testified that his knee felt unstable and that it popped out of joint at times. The Veteran also reported that his knee felt unstable to the VA examiner in May 2010. However, the stability of the Veteran's right knee was tested on multiple occasions, including January 2006, February 2006, and May 2010 and it was always found to be stable and/or without joint laxity indicating that the knee was not, in fact, unstable or subject to recurrent subluxation. Thus, a separate evaluation for instability or recurrent subluxation is not warranted. 

The Board further finds that the Veteran's symptoms do not present such an exceptional disability picture as to render the schedular rating inadequate. 38 C.F.R. § 3.321(b). See also Thun v. Peake, 11 Vet. App. 111, 115 (2008) (the threshold factor for extraschedular consideration is a finding that the evidence before VA presents such an exceptional disability picture that the schedular evaluation is inadequate). The Veteran's symptoms of painful, limited motion of the knee are fully contemplated by the rating schedule. 

The Board acknowledges that VA is statutorily required to resolve the benefit of the doubt in favor of the Veteran when there is an approximate balance of positive and negative evidence regarding the merits of an outstanding issue. See, e.g., Gilbert v. Derwinski, 1 Vet. App. 49, 55 (1990); 38 U.S.C.A. § 5107(b). However, the preponderance of the evidence was against the Veteran's claims for a higher rating prior to February 13, 2006 and after February 20, 2006.



 (CONTINUED ON NEXT PAGE)

ORDER

An initial compensable rating of 10 percent, but no more, for s/p right anterior cruciate ligament reconstruction for the period beginning February 13, 2006, but no earlier is granted, subject to the law and regulations governing the award of monetary benefits.

A rating in excess of 10 percent for s/p right anterior cruciate ligament reconstruction for the period beginning February 13, 2006, is denied.


____________________________________________
MICHAEL D. LYON 
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs